UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

               Plaintiff,

       v.

DENNIS D. COPELAND and LEGAL
COURIERS, INC.,

           Defendants.

No. CV-08-3065-FVS

ORDER GRANTING AND
DENYING SUMMARY JUDGMENT

**THIS MATTER** comes before the Court without oral argument based upon the United States' motion for summary judgment.  The United States is represented by Timothy M. Durkin and Tyler H.L. Tornabene.  Dennis D. Copeland is representing himself.  Legal Couriers, Inc., is not represented by an attorney.

**BACKGROUND**

The United States Department of Agriculture ("USDA") loans money to low-income persons so they may purchase homes.  The purchaser must mortgage the property in order to secure repayment of the loan.  If the purchaser fails to repay the loan, the USDA may foreclose the mortgage.  This case stems from the USDA's decision to foreclose three mortgages.  The USDA hired a company named ABC/LMI to conduct the foreclosures.  Foreclosure is, of course, a multi-step process.  One of the last steps is a public auction at which the mortgaged property is sold to the highest bidder.  ABC/LMI hired a company named Legal Couriers, Inc., to hold the auctions.  Dennis Copeland owns a majority

ORDER - 1

of the stock in Legal Couriers and is its president.  He delegated
responsibility for the auctions to one of the company's employees, a
man named Bacil Shirley.  The United States alleges Mr. Shirley
colluded with bidders on two occasions; once during October of 2002
and once during January of 2003.  According to the United States, two
bidders paid Mr. Shirley to submit forms to ABC/LMI indicating their
high bids were less than they actually were.  ABC/LMI was unaware of
Mr. Shirley's alleged deceit.  Consequently, ABC/LMI transmitted the
false information to the USDA, which approved the fraudulent sales.
Eventually, the USDA commenced an investigation and discovered the
fraud.  Mr. Shirley pleaded guilty to bribery of a government
official.  18 U.S.C. § 201(b)(1)(B).  Now, the United States has filed
a civil action against Legal Couriers, Inc., and its president, Mr.
Copeland, alleging they violated the False Claims Act ("FCA"), 31
U.S.C. § 3729 *et seq.*  The Court has jurisdiction over the subject
matter of the action, 28 U.S.C. § 1331; and since at least one of the
defendants transacts business in the Eastern District of Washington,
venue is proper here.  28 U.S.C. § 3732(a).

**RULE 56**

The United States moves for summary judgment pursuant to Federal
Rule of Civil Procedure 56.  Since the United States will bear the
burden of persuasion at trial, "it must come forward with evidence
which would entitle it to a directed verdict if the evidence went
uncontroverted at trial."  *C.A.R. Transportation Brokerage Co., Inc.
v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir.2000).  If the
United States satisfies its initial burden, the burden of production
shifts to the defendants.  They must produce evidence that would
permit a rational fact-finder to find for them on the United States'

ORDER - 2

claims.  However, the United States retains the ultimate burden of persuading the Court it is entitled to summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In order to prevail under Rule 56, the United States must establish that a rational fact-finder would be compelled to find in its favor at trial.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.2007).

**CAUSE OF ACTION UNDER (FORMER) 31 U.S.C. § 3729(a)(1)**

The United States alleges the defendants violated 31 U.S.C. § 3729(a)(1) during the Fall of 2002 and the Winter of 2003.  As § 3729(a)(1) was then written, it imposed liability upon any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval[.]"  The text of § 3729(a)(1) set forth three explicit elements.  They were "(1) a 'false or fraudulent' claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false."  *United States v. Mackby*, 261 F.3d 821, 826 (9th Cir.2001) (quoting 31 U.S.C. § 3729(a)(1) (1994)).  To these three elements, the Ninth Circuit added a fourth, *viz.*, the false claim must be material.  *United States v. Bourseau*, 531 F.3d 1159, 1170-71 (9th Cir.2008).  A false claim is material if it has the potential effect, or a natural tendency, to influence the decisionmaking of the body to which it was presented.  *Id.* at 1171 (internal punctuation and citations omitted).

**INDIVIDUAL LIABILITY OF DENNIS COPELAND**

A. Dispute Between the United States and Mr. Copeland

The United States argues the president of a corporation may be

ORDER - 3

held liable individually for a false claim that is submitted by a company employee on behalf of the corporation to a federal agency if, in fact, the president knows the claim is false. Mr. Copeland does not dispute the assumptions upon which the United States' argument is based, and he has admitted a number of the United States' allegations. The facts he has admitted are sufficient, as a matter of law, to satisfy three of the four elements listed above. Mr. Shirley was an employee of Legal Couriers at all times relevant to this action. Mr. Copeland delegated the responsibility for conducting foreclosure auctions to him. Acting pursuant to the authority that had been delegated to him by Mr. Copeland, Mr. Shirley submitted false information, or caused false information to be submitted, to ABC/LMI concerning three bids. He expected ABC/LMI to transmit the false information to the USDA and to ask the USDA to approve the bids in question. These facts establish elements one and two, *i.e.*, the preparation of a false claim by a corporate employee on behalf of the corporation and the presentation of the claim to a federal agency. The USDA approved all three bids, but, as Mr. Copeland concedes, the USDA would not have done so had it known of Mr. Shirley's deceit. These facts establish element four, *i.e.*, the false claims were material. Consequently, only element three -- *i.e.*, knowledge -- poses a potentially triable issue.

B. Knowledge

The FCA defines the term "knowledge." 31 U.S.C. § 3729(b)(1). In essence, there are three situations in which a person is accountable under the FCA for knowing particular information. One occurs is when he "'has actual knowledge of the information[.]'" *Bourseau*, 531 F.3d at 1167 (quoting 31 U.S.C. § 3729(b)). Another

ORDER - 4

occurs is when he "'acts in deliberate ignorance of the truth or falsity of the information[.]'" *Id.* A third occurs is when he "'acts in reckless disregard of the truth or falsity of the information.'" *Id.*

The United States does not allege Mr. Copeland actually knew Mr. Shirley falsely reported bids in three instances. However, the United States does allege he was aware of signs indicating Mr. Shirley was colluding with bidders. Mr. Copeland denies he was on notice of collusion, but he does concede he became suspicious. Under the FCA, a person's failure to adequately investigate suspicious behavior can constitute knowledge of the behavior:

> In defining knowingly, Congress attempted "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." S.Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5286. Congress adopted "the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id.* at 20[.] . . . "While the Committee intends that at least some inquiry be made, the inquiry need only be 'reasonable and prudent under the circumstances.'" *Id.* at 21.

*Bourseau*, 531 F.3d at 1168.

C. Mr. Copeland and Mr. Shirley

In order to determine whether Mr. Copeland conducted reasonable and prudent inquiries, it is necessary to examine his relationship with Mr. Shirley. Mr. Copeland did not hire Mr. Shirley. He was hired by Scott Ruegsegger, the minority stockholder in Legal Couriers. Although Mr. Copeland did not hire Mr. Shirley, he was pleased with

ORDER - 5

Mr. Shirley's work.  According to Mr. Copeland, he excelled at the tasks he was assigned.  Consequently, Mr. Copeland delegated to him responsibility for conducting foreclosure auctions.  During the Summer of 2002, Mr. Shirley submitted a plan to Mr. Copeland for making additional money.  Mr. Shirley suggested that he offer to notify prospective bidders of financially attractive properties that were scheduled to be auctioned.  A bidder who purchased one of the properties he identified would pay him a cash fee.  Mr. Copeland approved Mr. Shirley's plan.  At least some persons accepted Mr. Shirley's offer.  On four to six occasions during the second half of 2002, Mr. Shirley provided cash to Mr. Copeland.  Mr. Shirley said the money was Mr. Copeland's share of a fee he had received.  Mr. Copeland received $100.00 to $200.00 in cash from Mr. Shirley on each of these occasions.  Mr. Copeland did not treat the cash as corporate income.  Instead, he pocketed it.  The parties disagree sharply with respect to whether it was ethical for Mr. Shirley to receive cash from bidders to whom he had provided advance notice about properties that were scheduled to be auctioned.  The United States calls it a "kickback."  Mr. Copeland calls it a "finder's fee."  At this juncture, the Court need not decide which party is correct; for it is undisputed Mr. Shirley engaged in illegal conduct during October of 2002 and January of 2003.  On October 18, 2002, he auctioned a parcel of property.  One of the bidders was a man named Roy D. Campbell.  His opening bid was for $34,000.00; but other persons were interested in the property.  Mr. Campbell had to bid $44,000.00 in order to purchase the property.  Afterward, he asked Mr. Shirley to roll back the high bid from $44,000 to $34,000.  Mr. Shirley agreed to do so.  He submitted forms to ABC/LMI, or caused forms to be submitted, indicating the high bid was

ORDER - 6

$34,000.  It is unclear how much money Mr. Campbell paid Mr. Shirley.
ABC/LMI relayed the false information to the USDA, which approved the
sale.  As early as November of 2002, Mr. Copeland noticed a change in
Mr. Shirley's demeanor.  Mr. Shirley became abnormally quiet and edgy.
Mr. Copeland suspected something was wrong.  After all, he was well
aware that some bidders at foreclosure auctions attempt to collude
with the auctioneer in an effort to obtain an unfair advantage in
purchasing property.  Nevertheless, Mr. Copeland did nothing.

On January 10, 2003, Legal Couriers auctioned two parcels of
property.  Walter Nelson was the high bidder at both auctions.  He
offered to pay Mr. Shirley to roll back his winning bids to lower
figures.  Mr. Shirley accepted his offer.  He submitted forms to
ABC/LMI, or caused forms to be submitted, indicating the high bids
were substantially less than they actually were.  He rolled back one
bid from $58,000 to $36,448.  He rolled back the other bid from
$37,779 to $36,448.  Mr. Nelson paid Mr. Shirley between $16,000 and
$20,000.  Mr. Shirley gave $900 to Mr. Copeland.  Mr. Shirley did not
tell Mr. Copeland where the money had come from, and Mr. Copeland did
not ask.  He simply assumed it was some sort of gratuity.  Within
days, Mr. Shirley's behavior deteriorated.  Not only did he become "an
absolute basket case," but also he began "acting paranoid" and was
"constantly shaking."  Mr. Copeland called Mr. Shirley into his office
and asked him what was going on.  Mr. Shirley deflected the question,
saying it is "better you don't know."  During the week following the
January 10th auctions, Mr. Shirley advised Mr. Copeland that other
bidders at those auctions were angry.  Mr. Shirley said he was going
to attempt to placate one of them; a man whose name is Doug Lemon.  He
did not explain how he intended to accomplish this goal.  A day or so

ORDER - 7

later, Mr. Shirley told Mr. Copeland he had visited Mr. Lemon and it looked like things were alright.  Shortly thereafter, Mr. Shirley stopped by Mr. Copeland's house and asked for a stiff drink.  Mr. Shirley warned Mr. Copeland he was going to have to fire him; but Mr. Shirley would not disclose why Mr. Copeland would be required to do so.  Approximately nine days after the January tenth auctions, the sales were recorded.  It was at this point that Mr. Copeland received two calls from a person who refused to identify himself, although Mr. Copeland is convinced the caller was a man named Terry Dunn.  During the first call, Mr. Dunn advised Mr. Copeland to get rid of Mr. Shirley and then hung up.  During the second call, which occurred the next day, Mr. Copeland encouraged Mr. Dunn to call ABC/LMI and report his suspicions.  As a result of Mr. Dunn's telephone calls, Mr. Copeland called ABC/LMI and spoke to Joe Marchese.  Mr. Copeland told Mr. Marchese that something was going on with the January 10th auctions and he wanted to get to the bottom of it.  Mr. Marchese called back a couple of days later.  He said he couldn't find anything wrong with the sales in question.  Nevertheless, during February of 2003, ABC/LMI told Mr. Copeland that it didn't want Mr. Shirley involved in its auctions.  Mr. Copeland complied with the company's request.  However, he did nothing else to investigate the propriety of the January 10th sales.  The USDA commenced an investigation of its own during 2004.

D. Mr. Copeland's Inquiries

The government alleges Mr. Copeland is individually liable for false information his company, Legal Couriers, sent to ABC/LMI with respect to sales that took place not quite three months apart.  Given the amount of time that elapsed between the sales in question, it is

ORDER - 8

necessary to consider them separately.

*1. October 18th auction*

It is undisputed Mr. Shirley caused Legal Couriers to submit false information to ABC/LMI with respect to the "Campbell" bid at the auction which occurred on October 18, 2002.  Thereafter, Mr. Shirley's behavior changed; a circumstance that prompted Mr. Copeland to become suspicious.  Given the totality of the information that was available to Mr. Copeland during the Fall of 2002, a rational fact-finder arguably could find he had a duty to investigate the integrity of the October 18th auction; a duty he failed to perform.  However, the information that was available to Mr. Copeland during the Fall of 2002 was susceptible of more than one reasonable interpretation.  While a rational fact-finder could find the information was sufficient to trigger a duty to investigate, it would not be compelled to make such a finding.  Thus, the United States is not entitled to summary judgment against Mr. Copeland with respect to the October 18th auction.  Mr. Copeland is entitled to a trial on this issue.

*2. January 10th auctions*

By January of 2003, Mr. Shirley had been giving Mr. Copeland sums of cash for several months.  The existence of the gifts indicated Mr. Shirley was soliciting, and receiving, fees from potential bidders in exchange for information he was providing to them.  Even if it was ethical for Mr. Shirley to sell the information to potential bidders (an issue the Court need not resolve at this juncture), Mr. Copeland should have been concerned.  He knew bidders attempt to collude with auctioneers in order to obtain unfair advantage at auctions.  The fact Mr. Shirley was accepting money from potential bidders should have suggested to Mr. Copeland that Mr. Shirley likely was being exposed to

ORDER - 9

temptation.  And indeed, when Mr. Shirley's behavior began to change during the Fall of 2002, Mr. Copeland became suspicious.  His suspicions should have been further aroused by the events that occurred between January 10, 2003, and the end of the month.  To begin with, Mr. Shirley gave him $900.  This sum was substantially larger than the gifts Mr. Shirley had given him in the past.  Mr. Copeland did not demand an explanation from Mr. Shirley.  He simply assumed this gift was similar to the others he'd been receiving.  Furthermore, Mr. Shirley's comments clearly indicated something was wrong.  Among other things, he told Mr. Copeland that unsuccessful bidders at the January 10th auctions were angry; that he was trying to placate one of them; that it was better Mr. Copeland did not know what was going on; and that Mr. Copeland was going to have to fire him.  Taken together, these comments strongly indicated the January 10th auctions had not been conducted properly; especially when combined with the telephone calls from Mr. Dunn.  Indeed, after receiving Mr. Dunn's telephone calls, Mr. Copeland telephoned Joe Marchese.  However, Mr. Copeland provided very little information to him.  For example, Mr. Copeland did not disclose the gifts Mr. Shirley had been providing; particularly the $900 gift he received shortly after the auction.  Nor did he disclose Mr. Shirley's change in behavior and his suspicious comments.  Given these omissions, no rational jury could find that Mr. Copeland's telephone call to Mr. Marchese constituted an adequate inquiry.  This conclusion is reinforced by the absence of any other investigation by Mr. Copeland.  For example, he did not ask Mr. Shirley to give him the names of the persons who bid at the January 10th auctions.  Had Mr. Copeland done so, he could have called them and asked them what they had bid.  This would have enabled him to

ORDER - 10

compare their bids with the sales price that was contained in the county auditor's records.  Apparently, Mr. Dunn made the comparison; which is how he knew Mr. Shirley had colluded with a rival bidder.

Were a rational jury presented with the evidence that is summarized above, the jury would be compelled to find Mr. Copeland was confronted, during January of 2003, with information strongly suggesting Mr. Shirley had colluded with one of the January 10th bidders.  Furthermore, the jury would be compelled to find Mr. Copeland buried his head in the sand when he became aware of the information.  He did not conduct a meaningful investigation of his own, and he withheld material information from Mr. Marchese; thereby preventing ABC/LMI from conducting a meaningful investigation of its own.  As a result, the jury would be compelled to find he acted with a reckless disregard for the accuracy of the information his company submitted to ABC/LMI concerning the January 10th auctions.  Thus, as far as the FCA is concerned, he is accountable for knowing the information was false.  This was the only unresolved element of the United States' FCA claim against Mr. Copeland.  Since he has admitted all of the other elements, it follows he is individually liable under 31 U.S.C. § 3729(a)(1) for the false information Legal Couriers submitted to ABC/LMI with respect to the "Nelson" bids at the auctions which occurred on January 10, 2003.

**LIABILITY OF LEGAL COURIERS**

A. Absence of Representation

On November 26, 2008, Attorney Reed C. Pell filed a notice of appearance on behalf of both Dennis Copeland and Legal Couriers, Inc. On January 14, 2009, Mr. Pell filed an answer on behalf of both defendants.  However, on September 18, 2009, Mr. Pell withdrew as

ORDER - 11

counsel of record.  Faced with Mr. Pell's withdrawal, Mr. Copeland had to retain a new attorney or represent himself.  He chose the latter course of action.  While this course of action is open to Mr. Copeland, it is not open to Legal Couriers.  Unlike an individual, a corporation may not proceed pro se.  Local Rule 83.6.  Indeed, Legal Couriers' failure to obtain representation constitutes a default.  *See Employee Painters' Trust v. Ethan Enters., Inc.*, 480 F.3d 993, 998 (9th Cir.2007) (a defendant corporation's violation of a local rule requiring corporations to be represented by counsel sufficed to support a default judgment against the corporation).  Legal Couriers may not participate further in the litigation unless, and until, it obtains representation.  *See United States v. Hagerman*, 549 F.3d 536, 538 (7th Cir.2008) ("at any point in a federal litigation at which a party that is not entitled to proceed pro se finds itself without a lawyer though given a reasonable opportunity to obtain one, the court is empowered to bar the party from further participation in the litigation").

B. Motion for Summary Judgment

The United States has moved for summary judgment against Legal Couriers.  The latter has failed to respond.  Its failure to do so is not a basis for granting the United States' motion.  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir.1993).  However, summary judgment is proper if the United States' moving papers are sufficient to support its motion and they do not, on their face, reveal a genuine issue of material fact.  *United States v. Real Property Located at Incline Village*, 47 F.3d 1511, 1520 (9th Cir.1995) *overruled on other grounds by Degen v. United States*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996).  The United States' summary judgment motion raises

ORDER - 12

several issues, two of which require discussion at this time.  One is whether Legal Couriers is vicariously liable for Mr. Shirley's misrepresentations.  Another is whether the Court should pierce Legal Couriers' corporate veil and impose liability upon its majority shareholder, *i.e.*, Mr. Copeland.

    *1. Vicarious liability*

    Mr. Shirley was Legal Couriers' agent.  The United States alleges Legal Couriers is vicariously liable for his fraudulent misrepresentations concerning bids at the October 18th and January 10th auctions.  "[A] principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority."  *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).  "An agent acts with apparent authority in making a fraudulent misrepresentation to a third party when the third party reasonably believes that the agent has authority to make the particular representation on behalf of the principal."  Restatement (Third) of Agency § 7.08 cmt. c.  It is undisputed Mr. Copeland delegated responsibility for foreclosure auctions to Mr. Shirley.  One of Mr. Shirley's duties was to submit forms to ABC/LMI indicating the high bid at each foreclosure auction.  Mr. Shirley knew that ABC/LMI relied upon the accuracy of the forms he submitted.  And given the longstanding relationship between ABC/LMI and Legal Couriers, ABC/LMI reasonably believed the forms submitted by Mr. Shirley were accurate.  Thus, Mr. Shirley had apparent authority to make representations on behalf of Legal Couriers regarding bids at foreclosure auctions.  Legal Couriers is vicariously liable for his fraudulent misrepresentations.

*2. Piercing the corporate veil*

The United States urges the Court to pierce Legal Couriers' corporate veil and impose liability upon Mr. Copeland, its majority shareholder.  There are two reasons why the Court declines to do so at this stage in the proceedings.  For one thing, the United States' request may become moot.  For another thing, genuine issues of material fact exist.

(a) mootness

Mr. Copeland is individually liable for the false information Legal Couriers submitted to ABC/LMI with respect to the January 10th sales.  Whether he also is individually liable for the information Legal Couriers submitted with respect to the October 18th sale is an unresolved issue.  Depending upon the evidence presented at trial, the fact-finder may determine he is.  If he is individually liable with respect to all three sales, the United States' request to pierce Legal Couriers' corporate veil may become moot.

(b) jury issues

The United States bears the burden of demonstrating Legal Couriers' corporate veil should be pierced.  The Court must consider three factors:  "the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators."  *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir.1979).  The United States must prove the first factor, and either the second or the third.  *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir.1994).  The United States argues the Court may find the first factor -- *i.e.*, disrespect of Legal Couriers' separate corporate

ORDER - 14

identity -- based upon the following circumstances:  To begin with,
Mr. Copeland allegedly failed to inform the minority stockholder,
Scott Ruegsegger, about the problems Mr. Shirley was having and the
decisions he was making concerning Mr. Shirley.  In addition, Mr.
Copeland allegedly failed to issue corporate dividends from the year
2000 until the present.  Finally, he allegedly failed to hold meetings
of either the corporation's directors or shareholders.  Mr. Copeland
disputes the United States' interpretation of the record.  He denies
the preceding circumstances show he treated Legal Couriers' separate
corporate existence with disrespect.  In his opinion, all they
demonstrate is the difficulty of managing a small business.  He may or
may not be correct in that regard.  However, he has established that
genuine issues of material fact exist as far as the first factor is
concerned.  That being the case, it is unnecessary to consider the
second and third factors.  The United States is not entitled to
summary judgment on its request to pierce the corporate veil.

    **IT IS HEREBY ORDERED:**

    1. Legal Couriers is barred by Local Rule 83.6 from representing
itself in this action.

    2. The District Court Executive shall enter the default of Legal
Couriers.

    3. Legal Couriers may not participate further in this action
unless, and until, it obtains representation by an attorney and its
default is set aside.

    4. The United States' motion for summary judgment (**Ct. Rec. 36**)
is **denied in part and granted in part:**

    (a) Genuine issues of material fact exist with respect to whether
Dennis Copeland can be held personally accountable under the FCA for

ORDER - 15

knowing the information Legal Couriers submitted concerning the "Campbell" bid at the October 18, 2002, auction was false.

(b) Mr. Copeland is personally liable under 31 U.S.C. § 3729(a)(1) for the false information Legal Couriers submitted with respect to the "Nelson" bids at the auctions that occurred on January 10, 2003.

(c) Legal Couriers is vicariously liable for Bacil Shirley's fraudulent misrepresentations regarding both the "Campbell" bid at the October 18, 2002, auction and the "Nelson" bids at the January 10, 2003, auctions.

(d) Genuine issues of material fact exist with respect to whether Legal Couriers' corporate veil should be pierced.

(e) The Court reserves ruling with respect to damages and penalties.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel for the plaintiff and to Mr. Copeland.

**DATED** this ___23rd___ day of December, 2010.

_____s/ Fred Van Sickle_____
Fred Van Sickle
Senior United States District Judge

ORDER - 16